[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: APPLICATION FOR TEMPORARY INJUNCTION (#101)
This is a decision regarding an application for temporary injunction brought by the plaintiffs at the commencement of their action against the defendants. The plaintiffs are Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Variable Life Company, Colonial Insurance Company of California and Nationwide Property and Casualty Company (hereinafter collectively, "Nationwide"). The defendants are Robert York and The York Insurance Agency, Inc.
In this action, Nationwide makes the following claims against Mr. York individually: breach of duty of loyalty; breach of contract and breach of fiduciary duty. As against the York Agency, Inc., only, Nationwide claims aiding and abetting the breach of a fiduciary duty. As against both CT Page 12550 defendants, Nationwide claims conversion, civil theft, violation of the Connecticut Uniform Trade Secrets Act (CUTSA), General Statutes § 35-50
et seq., tortious interference with contract rights and other business relations, violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and unjust enrichment.
In their application for temporary injunction, the plaintiffs seek an order enjoining the defendants from (1) using or retaining all or any portion of the following that Nationwide claims ownership of: policyholder files, information, contact and access information, pricing structure information, marketing and sales strategies, inter-company communications, product information and sales information, trade secrets, and confidential information; (2) from contacting or soliciting any Nationwide policyholders or client whose identity was learned by defendant York when he was in the course of his independent contractor relationship with Nationwide; (3) representing, directly or indirectly, to any person that the defendant(s) are authorized to act on behalf of Nationwide; and (4) to deliver to Nationwide all of its property, including policyholder files and all their contents, and to account for any such property no longer in defendants' possession. The defendants oppose this application.
 I. Facts
The following facts are found. Robert York has worked in the insurance field, in one capacity or another, with Nationwide since November, 1972. He started as an agent for one year and then worked in management for four years. Commencing in 1976, he once again became a Nationwide insurance agent. Since 1972, he has been an exclusive agent for Nationwide pursuant to independent contractor agreements between himself and Nationwide. Three separate independent contractor agreements were signed between the parties, the most recent in 1987. Pursuant to his exclusive agency, he was to sell only Nationwide products to customers unless Nationwide did not offer the product a customer was seeking or Nationwide had rejected the coverage sought by the customer.
In 1979, York was joined by another Nationwide exclusive independent agent, Karl M. Carlson. They formed the York-Carlson Insurance Agency, Inc. in that year and remained working together until Nationwide terminated its agreement with York in May, 2000. Throughout, Nationwide maintained a separate agency agreement with each of them.
The agreement between York and Nationwide was drawn up by Nationwide. York had no input into its contents or language: he could either have signed it as presented, or not, in which case he would no longer work with Nationwide. On three occasions, he was presented with a new CT Page 12551 agreement and he signed each. The agreement effective at the time of York's termination by Nationwide was signed on December 8, 1986 and effective on January 1, 1987. Pursuant to that agreement, York, as an independent contractor, was responsible for all his expenses involved in the solicitation, procurement and maintenance of business pursuant to his agency with Nationwide. The agreement provided that upon its cancellation, Nationwide retained the right to continue to provide insurance services to any and all customers and to continue to solicit such customers for additional business. That provision of the agreement contained no other language explaining, specifying, or limiting the rights of either parties to service customer when the agreement was canceled.
The agreement made provision for York to accrue Deferred Compensation Incentive Credits and Extended Earnings. Extended earnings are an amount equal to the renewal fees paid to York for the 12 months immediately prior to the cancellation of the agreement. In order to be payable, the reasons for cancellation of the agreement were required to qualify under certain criteria established in the agreement: "[u]nless you have induced or attempted to induce, either directly or indirectly, policyholders to lapse, cancel, or replace any insurance contract in force with the Companies [Nationwide], the cancellation of this Agreement shall be a qualified cancellation of purpose of this Agreement."
In 1984, York and Carlson commenced working with the Nationwide computer system. It is presently utilized for office administration, file management and formulation of quotes for prospective customers. York was required to utilize the Nationwide computer system called the AOA system. (It was variously referred to as the AOL system throughout the hearing on this matter.) He leased the system and its software from Nationwide. The lease agreement was for one year, renewable annually at the request of either party.
The defendant was divorced from his then wife in 1995. During the pendente lite period of the divorce, and at the final hearing, the defendant submitted sworn financial affidavits to the court, detailing his income, assets, and liabilities. In neither affidavit did he list or declare his insurance agency or policyholder files as an asset. It is this failure that lays the foundation for Nationwide's estoppel claims, discussed later.
The wife of Mr. York worked in his office for years prior to the parties' dissolution. She handled all of the financial books and records of his insurance agency. The dissolution judgment resulted from a written agreement between the parties. The agreement recites, "[h]usband shall retain his interest in the business known as York-Carlson Insurance CT Page 12552 Agency. . . ."
The termination of the defendant York's agency agreement by Nationwide was precipitated by a single event. York had received a memorandum from Nationwide addressed to him as one of the agents of the company. The memo was transmitted to him by e-mail and was entitled "Get'em back." It announced a strategy to try to regain customers lost to competitors in the past three years. It provided no details; the subject matter of the marketing initiative was stated, such as underwriting processes that could be investigated further by the agents by interactively clicking on the subject to learn the briefing of the topic. The memo was sent by York to James Warner of the Moraine Group, a competitor company. By means not related to the court, the document came to Nationwide at its Wallingford, Connecticut offices when it was faxed with cover letter by Mr. Warner to a man named Bob. Dean. That cover letter indicated that the defendant was "going with another independent agent who is building a group" and that Mr. Carlson was retiring. From this, therefore, Nationwide was notified of York's impending departure.
The facsimile alerted Nationwide's representatives in their main Connecticut office that it had originated with someone in the York-Carlson office. Mr. York was invited to a meeting at the Wallingford office to discuss the recent defections of agents. The invitation to the meeting was made by Greg Garbinski, who is the Connecticut Sales Manager for Nationwide. He gave York this false reason for the meeting at the direction of his superior, Joe Young. Young also intended to have legal counsel present at the meeting; York was not informed of this either. According to Garbinski, it was Young's position that it was necessary to give York a false reason for the meeting for he believed York would not attend.
When York arrived at the meeting, Young, Garbinski and an attorney for Nationwide were present. The meeting was held at the end of the business day. Young told York that his, Carlson's and another agent, Dunn's, names kept surfacing as agents intending to leave and he wanted to discuss that. Then the Nationwide attorney started to question York. She asked him, "do you have a fax machine?" He answered, "yes." She asked him if he had a header on it and he said, "yes." Then she asked him if he had the Nationwide computer system, which he acknowledged affirmatively. She asked him if he received e-mail on it, which he did. When she asked him what he did with e-mails, he said that he read them, and either printed, sent to a file or discarded and deleted them. She asked him if he ever sent e-mail to anyone and he said that he did send them between agents. She asked him if he was aware that e-mail was confidential information. He said he was not aware of this. She asked him if he ever faxed e-mail to someone outside the company. He asked, "why?" Then she showed him a CT Page 12553 copy of the fax that had gone to Warner. York inquired if his fax line was tapped, then said that he had faxed it. She asked York if he knew that sending confidential information could be grounds for termination and could jeopardize his contract. York reiterated that he did not know it was confidential information. She asked him again if he knew it could be grounds for termination. At that point, York stated that he should get an attorney. While the Nationwide attorney said he could do that, she further told him that there was no need for an attorney and he should cooperate or it would result in a termination of his agreement.
York stayed and gave the Nationwide representatives the information they sought on himself, Carlson and Dunn. He reiterated that he had no malicious intent in sending the document and that he did not think it was detrimental to Nationwide since Warner had gotten nothing of value from him. He stated again that he did not know that the document was confidential; it had no restricted markings. He was then interrogated as to whether he had sent it to others or had been talking to competitors about working for them He stated he had not sent the e-mail to others, and answered that he had been talking to other companies. At the end of the meeting, Young told York that he was on the fence as to whether to terminate him.
The following morning, Nationwide decided to terminate its relationship with York. Young sent Garbinski and Steve Miles to tell York. Garbinski arrived at York's office with a list of items he wanted to take back with him. The prepared list included everything Garbinski thought was important to pick up. The list was entitled "Office Inventory to be P/U [picked up] by Nationwide Sales Manager." It included: AOL back up tapes, ID cards, claims partnership checks and records, camera, PH [policy holder] files, manuals, and Nationwide forms! applications. Ultimately, Garbinski decided to leave the ID cards and Nationwide forms/applications with Carlson who was staying with Nationwide. Garbinski acknowledged that York turned over everything he requested except the policyholder files. They remain at York's office that he continues to share with Carlson. Both Carlson and York have access to those files.
Carlson signed an agreement with Nationwide to service all of the York policyholders for six months beginning on May 5, 2000. He and York continue to work in the same building with their two different insurance agencies. Carlson has unencumbered access to the policyholder files of York. The files are in an area of the building that is accessible to both York and Carlson. York does not have access to the Carlson/Nationwide computer system. Garbinski has acknowledged that there is not one instance in which York has not cooperated in Nationwide's servicing of its' policy holders.
CT Page 12554 The policy holder files were all created by York's efforts during his period of exclusive agency with Nationwide. The policyholder files are maintained by York alphabetically. They include information on both prospective as well as actual policyholders. The contents of these files include applications for insurance, information on prior insurance, costs of insurance, student report cards, photographs, replacement costs on insured assets, and comments that York himself had made into the file.
York is of the strong opinion that the policyholder files are owned by him. While in this litigation, Nationwide has asserted ownership over the files. Nevertheless, their policy has not always been so clear. The Nationwide manual, The Agency Administration Handbook Management Guide, states, "[i]f the agent resists the return of records, Sales Management must determine if the records are really needed. The factors to consider in making that determination are: (1) [s]ize of the agency. . . . The contract does not clearly define ownership of the . . . policyholder files. It is better to convince the agent to surrender the files, . . . rather than go through expensive legal procedures, to establish ownership."[1]
The Agent's Agreement between Nationwide and York states that manuals, forms, records, and such other materials and supplies furnished to York by Nationwide remain the property of Nationwide. Nothing in the agreement stated that policyholder files are the property of Nationwide.
Immediately after his termination by Nationwide, York set up the York Insurance Agency, Inc., which he continues to operate out of the same building with Carlson. The York Agency has a separate entrance and no visible affiliation with the Nationwide name or logo. On May 9, 2000, York, on the corporate letterhead of his new agency, sent a letter to his previous customers, Nationwide policyholders, announcing that he was operating an independent insurance agency. In the letter, York tells customers that their Nationwide policies are still in effect and prior to renewal they will receive a renewal notice from Nationwide and an alternative competitive quote from him. While the letter indicates York will compete for their business, it also indicates and reassures the customer that Nationwide remains available and continues to provide coverage to the customer.
The computer system that York operated was leased from Nationwide in 1990. His office has been computerized with prior systems since 1984. The software for application on the computer system asks questions about the customer and York input all of the customer information, including social security numbers, family member dates of birth, details of the automobile purchased or leased, the home purchase price and replacement price, driver's license number, accident and violation information, addresses of CT Page 12555 owner and drivers, and name, and address of lienholders. The information also reflected applicable discounts (good driver, good student, etc.), premiums and the terms of the insurance with Nationwide.
About two to three weeks prior to these events in early May, 2000, York had commenced to print from the AOL computer screen a "screen print" of every active policy that he had placed with Nationwide that was active. York was required to enter two passwords before accessing the policyholder information contained on the screen prints. The AOL system has warnings to users that all system use may be monitored. Knowledge of the agent's passwords is restricted only to the agent and knowledge of the same is not shared "in house" by Nationwide, although there is a source within Nationwide that holds all the passwords in case an agent forgets a password.
Since his departure from Nationwide, York has been offering policies with several companies. He has been in the process of getting individual appointments directly with a variety of companies. Where he does not yet have an individual appointment, he has been offering insurance as a subagent of another individual who does have appointments with those companies.
After commencing to compete with Nationwide on May 9, 2000, York has placed screen prints on motor vehicle and home customers with Nationwide's competitors and solicited quotes from them. The screen print information has included all the necessary input information for formulating a premium quote, prior Nationwide coverage with the customer, and the current Nationwide premium for that coverage. The screen prints contained all the information necessary to write a policy, as well as Nationwide's premium and coverage information. Nationwide provided the premium information to the screen, not York.
In the weeks before his termination, York provided his loss figures and income information from a five-year commission statement report to prospective employers, who were also competitors of Nationwide. This information also came to York from Nationwide. Nevertheless, it did not contain information that would allow a competitor to solicit Nationwide's business. Also, he and Carlson had printed screen information, cut off identifying policy holder information and gave it to competitors, in order to determine how competitive Nationwide was in the market.
Through the AOL computer system, Nationwide has had continuous access to all of the information on the screen prints for the policies that York sold. This can be brought up individually or by lists. Further, lists can be promulgated based upon expiration dates on a 30, 60 and 90 (for commercial) day basis to contact customers for renewals. In a CT Page 12556 communication to all Connecticut agents regarding competition by former agents, Joe Young assured them that Nationwide was "pleased with the success we have had in retaining Nationwide policyholders: We will actively encourage policyholders that left Nationwide to return through several renewal periods." This notice was sent on June 6, 2000, about one month after York's termination.
In the year prior to his termination, the income to the York-Carlson Agency, prior to expenses was approximately $135,000-136,000. After office expenses, York drew $75,000-76,000 personal income. The amount of Deferred Compensation that York sacrificed [by admittedly competing with Nationwide within one year of leaving and at the same location] is $332,860 as of March 1, 2000.
Nationwide's market share is 4% in Connecticut. Its greatest asset in Connecticut is its premiums from policyholders. Nationwide has assets in the range of $100 billion. From May 9, 2000 to the close date of hearing on this matter, 96 policies had been rewritten by York with another carrier. Most were automobile and home; there were a few umbrella policies as well.
York is married. He has one employee at his agency and, as of July 1, 2000, his son will be working with him as well. Over the years, he has invested hundreds of thousands of dollars in his insurance business to keep it operating and to develop business. He has throughout the time he was a Nationwide agent, assumed responsibility for all the operating expenses of his agency. Nationwide has never accepted responsibility for any of his agency expenses.
 II. Law A. Standard for Temporary Injunction Analysis
Nationwide is seeking a temporary injunction, enjoining the defendants from utilizing information gained by them from Nationwide's computer systems.
"The principle purpose of a temporary injunction is to preserve the status quo until the rights of the parties can be finally determined after a hearing on the merits." (Internal quotation marks omitted.)Clinton v. Middlesex Mutual Assurance Co., 37 Conn. App. 269, 270,655 A.2d 814 (1995). The standard for the granting of a temporary injunction in Connecticut is well settled. There is a four part test for the issuance of a temporary injunction: "(1) the plaintiff ha[s] no adequate legal remedy; (2) the plaintiff would suffer irreparable injury absent [the injunction]; (3) the plaintiff [is] likely to prevail . . .; CT Page 12557 and (4) the balance of the equities favor[s the issuance of the injunction]." Waterbury Teachers Association v. Freedom of InformationCommission, 230 Conn. 441, 446, 645 A.2d 978 (1994). "In general, a court may, in its discretion, exercise its equitable power to order a temporary injunction pending final determination of the order, upon a proper showing by the movant that if the injunction is not granted he or she will suffer irreparable harm for which there is no adequate remedy at law. . . . In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." (Citations omitted; internal quotation marks omitted.) Moore v. Ganim, 233 Conn. 557, 569, n. 25, 660 A.2d 742
(1995).
"[A] party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." (Internal quotation marks omitted.) Branch v. Occhionero, 239 Conn. 199, 207,681 A.2d 306 (1996).
"It is clear that the power of equity to grant injunctive relief may be exercised only under demanding circumstances." (Internal quotation marks omitted.) Anderson v. Latimer Point Management Corporation, 208 Conn. 256,262, 545 A.2d 525 (1988). "An injunction is an extraordinary remedy which is not mandatory, but is left to the court's sound discretion even if there is a proper showing of irreparable harm." Demers ExpositionServices, Inc. v. Porter, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 466 718 (September 12, 1995, Goldberg, J.). "Injunctive relief may not lie where it is predicated on the fears and apprehensions of the party applying for it or where it would be incompatible with the equities of the case. . . ." (Citations omitted.) Karls v. Alexandra Realty Corp., 179 Conn. 390,402, 426 A.2d 784 (1980).
 B. Standard for Trade Secrets Analysis
Nationwide argues that a violation of General Statutes § 35-50, the Connecticut Uniform Trade Secrets Act (CUTSA) forms the legal basis of its claim for violation of trade secrets. Nationwide claims that York has used information that has economic value in being maintained as a secret and that reasonable efforts to maintain the secrecy of this informatiom were employed. Given the facts of this case, the information claimed to be trade secrets are the policyholder files and the screen prints.
"The factors used to determine whether given information is a trade secret include the extent to which the information is known outside the business and by employees and others involved in the business, the measures taken by the employer to guard the secrecy of the information, CT Page 12558 the information's value to the employer and to competitors, the resources the employer expends in developing the information, and the ease or difficulty with which the information could be properly acquired or duplicated by others." Robert S. Weiss Associates, Inc. v.Wiederlight, 208 Conn. 525, 538, 546 A.2d 216 (1988).
"In reviewing these factors, courts also look to (1) the extent to which the employer-employee relationship was a confidential or fiduciary one; (2) the method by which the former employee acquired or compiled the alleged secret; (3) the former employee's personal relationship with the customers; and (4) the unfair advantage accruing to the former employee from the use of his former employer's alleged secret, Holiday Food Co.v. Monroe, 37 Conn. Sup. 546, 551." Dunsmore Assoc. v. D'Alessio,
Superior Court, judicial district of New Haven at New Haven, Docket No. 0409906 (September 3, 1998, Downey, J.). "Although factors exists to assist the court, it need not accord them equal weight or consideration." Id. The application of these factors to the facts of each case is a determination for the discretion of the trial court. Town Country House Home Service, Inc. v. Evans, 150 Conn. 314, 316, 320 A.2d 109 (1963).
Connecticut Statutes § 35-51 provides the definition of trade secrets and misappropriation. "`Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means, including searching through trash." General Statutes § 35-51(a) "`Misappropriation' means: (1) [a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-210, sections 31-40j
to 31-40p, inclusive, or subsection (c) of section 12-62; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." General Statutes § 35-51(b)" `Person' means a natural person, corporation, limited liability company, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity." General Statutes § 35-51(c) "Notwithstanding the provisions of sections 1-210,31-40j to 31-40p, inclusive, and subsection (c) of section 12-62, `trade CT Page 12559 secret' means information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." General Statutes § 35-51(d).
 III. Discussion A. Trade Secrets 1. Policyholder Files
The plaintiffs in their memorandum rely on their trade secrets cause of action for the issuance of the temporary injunction. The plaintiffs have pled a cause of action under the statutory remedy. No cause of action has been brought under the common law.[2] The Connecticut Uniform Trade Secrets Act provides, "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined upon application to any court of competent jurisdiction." General Statutes § 35-52(a).
At the outset, before an analysis of these governing principles and their applicability to the facts before the court, Nationwide argues that the York is estopped from claiming ownership of the policyholder files that are at issue here because York did not assert ownership of the policyholder files when he disclosed his assets to the court at the time of his divorce. This is a specious argument.
While his financial affidavit does not list ownership of any item of that detail, it also does not disclose his ownership of his insurance agency. This cannot be deemed a fraud upon his wife or upon the court. York's wife worked in the office for years; she had to know he owned his agency, she handled the books. She knew the contents of the office from her daily presence there. The separation agreement which was submitted to the court as the basis for the judgment entered disclosed York's ownership of his agency. When disclosing ownership of a business to the court in a matrimonial matter, he need not detail its every composite part. The only mystery that might have remained for York's ex-wife and the court would have been the value of the business and its composite parts. That, however, is irrelevant to Nationwide's claims here.
Nationwide claims the policyholder files, and their contents, to be trade secrets that are owned by them. It is Nationwide's position that York is at a distinct marketing advantage because he has access to the CT Page 12560 files at the same time as Carlson. Nationwide appears to take the position that the policyholder files are synonymous with the policies themselves. The court rejects this assertion. While the files may hold the policies, they contain far more information than that.
In general, neither York nor any other agent or manager who testified before the court ever received any documentation from Nationwide as to what it considered to constitute trade secrets. None of these individuals were ever asked to sign any document ordering them to refrain from disclosing trade secrets or requiring acknowledgment that what they learned or received in their employ constituted a trade secret. The agreement between York and Nationwide, and its predecessor agreements make no mention of trade secrets.
The Code of Ethics and Business Practices provided by Nationwide to its agents specifically disclosed to the agents that "[i]t is not intended to create an employment contract." The letter accompanying the code states that "[t]he use of this material is optional at your discretion." Therefore, the court need not inquire further as to the applicability of this code to the conduct of York. As stated by Nationwide, it has no contractually binding force.
The policyholder files contain notes made by the defendant York, data provided by the customers to York, documents provided by the customers to York and the names of all policyholders. The policyholder files also contain uninsured and underinsured forms, waivers for coverage or removal of coverage, original automobile and homeowner paper applications, "do not call" lists, report cards, appraisals, replacement cost estimates, pictures of insured property, and late pay correspondence (the notice of which is received from Nationwide.)
Carlson has unimpeded access to the York policyholder files. The cabinets are not locked and are readily accessible to workers of both insurance agencies. Carlson has entered the files to seek information that was not in the Nationwide AOL computer system in order to check a deductible, check phone numbers and addresses (which were the same as those on the computer), and to rate a commercial policy for a customer. Nationwide has not provided Carlson any directive to copy the contents of the policyholder files. Although York has offered Nationwide the right to copy the contents of all of the policyholder files, Nationwide has never asked York for a copy of the contents of the files.
Miles, the Nationwide state sales manager, has trained Nationwide agents since 1979. In their training, agents are told by Miles that Nationwide owns the policies and everything and anything that Nationwide has given the agent. Nevertheless, York has never received notice from CT Page 12561 Nationwide stating that its position was that it owned the policyholder files.
York is not the only former Nationwide agent in Connecticut competing with Nationwide. Policyholder files have been procured by Nationwide from some of these former agents, but not all of them. Nationwide has not brought legal action against every ex-agent who has immediately competed while retaining the policyholder files. An ex-agent, Scott Jeavons, was an exclusive independent agent who left Nationwide in April, 1999. Jeavons' insurance agency is in Central Village, in northeastern Connecticut. Miles came to Jeavons' office to pick up Nationwide's property. Jeavons returned the computer system, manuals manual files and forms to Miles. As Miles was leaving he asked Jeavons, "what about the files," to which Jeavons told him, "they're mine." Miles responded "uh ok." Having packed everything else and given it to Miles, Jeavons understood Miles' reference to be to the policyholder files. After that interchange, Jeavons undertook to immediately compete with Nationwide and write insurance for other customers from the same office in the same geographic area in which he had been a Nationwide agent. Upon his departure from Nationwide, Jeavons had approximately 500 policyholders with policies written with Nationwide. Since that date, he has rewritten many of them with other companies. Nationwide has not attempted to obtain the Jeavons policyholder files and it has instituted no legal action against Jeavons.
This court finds that the policyholder files are not trade secrets. In applying the definition of trade secrets to the policyholder files, the court finds that the files contain information obtained from customers by York as a result of the relationship that York had cultivated with these customers. The files were created by York at his own expense during his tenure with Nationwide. When asked to surrender the files, the defendant refused. The evidence further indicates that Nationwide did not remove policyholder files from other "defecting" agents, although other materials were quickly removed upon their defection. The Nationwide agreements, drafted by Nationwide, indicate that the, "contract does not clearly define ownership of the documents or files." Therefore, in the minds of those at Nationwide, owner ship of the files is, at best, unclear. Finally, at present, the policyholder files retained by York are fully accessible to Carlson who remains a Nationwide agent. By extension, the policyholder files are still accessible to Nationwide.
 2. Screen Prints
Nationwide also claims that the screen prints York retained from the Nationwide computer system constitute trade secrets. The screen prints of the policyholders include all their coverage and premium information. The CT Page 12562 information in the screen prints contained premium information which was provided to the system by Nationwide. The information contained on the screen print document for each policyholder remains within the Nationwide computer system. York has not had access to the Nationwide computer system since the day he was terminated.
York made the screen prints from Nationwide's own computer system and software, which was leased to him by Nationwide. These screen prints are the documents that York placed with two of Nationwide's competitors, after he left Nationwide, to procure competitive. quotes for the same coverage. By the close of this hearing, 96 policies were rewritten by the defendant with competitor companies.
Nationwide went to great effort to protect the secrecy of this information by password protecting the system at two points. The premium information contained therein is not known outside of Nationwide but is known to Nationwide agents by virtue of their access to the AOL system. The information contained in the screen prints is valuable to Nationwide and to its competitors because the premium information contained therein can be used by competitors to lure Nationwide customers away with more competitive rates. Finally, by virtue of the lease agreement on the system and the password protection, the information on the screen prints could not easily be properly acquired or duplicated by others.
In this case, York did acquire the screen prints by accessing and printing them when he knew he would be leaving Nationwide, but while he remained a Nationwide exclusive agent and had access to otherwise confidential information. While it was York who directly initiated, cultivated and maintained relationships with Nationwide policyholders, he did gain an unfair advantage by using the ill-gotten screen prints in order to keep his customers in insurance with competition insurance companies. Accordingly, the court finds that the screen prints are trade secrets and that they were misappropriated by the defendant.
 3. E-Mail
The document which York received about the new marketing approach was received through e-mail. (Exhibit 10.) It was not marked confidential or otherwise restricted. It was not used by Warner in any way. Warner was already aware of the new marketing tactic because he communicates with many Nationwide agents daily. York has received correspondence of many sorts through the e-mail system from Nationwide or Nationwide agents. These have included things as mundane as notice of company picnics. Accordingly, the court finds that the e-mail contained in Exhibit 10 is not a trade secret.
CT Page 12563 B. Injunctive Relief
It is true that injunctive relief is an extraordinary remedy that may be granted only under the most demanding circumstances. An injunction may not be granted where it is incompatible with the equities of the case.
While Nationwide has proven its probable success on the merits of the case, at least as to the trade secrets count, this court finds that the equities require this court to deny the application for temporary injunction. York did admit to competing with Nationwide in violation of his agreement and he does not contest the resulting sacrifice of more than $300,000 in Deferred Compensation.
"A covenant not to compete is reasonable when the character of the business or the nature of the employment are such that the employer requires protection against competitive activities by one who has become familiar with it through employment therein [and such] restrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights. . . . When, as here, a high degree of similarity between an employee's former and current employment makes it likely that the former employer's trade secret and other confidential information will be disclosed either intentionally or inadvertently, by the employee in the course of his new employment, enforcement of a covenant not to compete is necessary to protect against such use and disclosure. . . . (Alterations in original, citations omitted, internal quotation marks omitted.) Aetna Retirement Services, Inc. v. Hug,
Superior Court, judicial district of Hartford/New Britain at New Britain, Docket No. 479974 (June 18, 1997, Holzberg, J.).
Nationwide's enforcement of its noncompete clause serves the purpose of a remedy resulting from trade secret disclosure by York. An agent such as York possesses confidential information of Nationwide. The protection of trade secrets is inextricably wound up with the rationale for and the enforcement of noncompete clauses. York has forfeited a substantial sum of money, in excess of $300,000.00 to Nationwide that would otherwise be a windfall to Nationwide. Nationwide adduced no evidence to suggest that their income loss from York's actions would approach that sum of money. Nationwide still has access to the policyholders; it has not actively sought to encourage these policyholders, found, cultivated and serviced by York historically, to remain with Nationwide. Nationwide has not sought to treat all its agents the same where they have directly competed with Nationwide, utilizing the experience they had gained as Nationwide agents as to policyholders, rating and premiums. On balance, the equities of this case prevent this court from exercising its discretion to grant the injunction. Accordingly, for the foregoing reasons, the Application for Temporary Injunction is hereby denied. CT Page 12564
It is so ordered.
By the Court,
Munro, J